# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JOSEPH FRANCIS MALLOY     *

Plaintiff     *

v.     *     Civil Action No. RDB-08-2303

JOHN ROWLEY, et al.     *

Defendants     *

***

## **MEMORANDUM OPINION**

Pending is Defendants' Motion to Dismiss or for Summary Judgment which, by Order of this Court, has been supplemented with further evidence relevant to Plaintiff's assignment to the Special Management Unit (SMU) at North Branch Correctional Institution (NBCI). Plaintiff has not responded to the allegations raised by Defendants in the dispositive motion or the subsequently filed supplements, but contacted the Court seeking a copy of the settlement Order filed in *Cabana v. Warden*, Civ. Action JFM-07-2205 (D. Md.).[1] indicating he wished to continue to pursue the claims raised in the Complaint despite his assignment to general population. For the reasons that follow, Defendants' Motion as supplement, construed as a Motion for Summary Judgment, will be granted.

### Background

Plaintiff states that on August 2, 2007, he was transferred from Eastern Correctional Institution (ECI), a medium security prison, to the SMU at NBCI, which he describes as a super-maximum security prison. Paper No. 1 at p. 4. He claims the transfer took place without advance notice or forewarning. He states the transfer violated his right to due process because the conditions under which he was confined were cruel and unusual and he lacked the bare

---

[1] *Cabana* involved similar claims regarding a transfer to North Branch Correctional Institution and assignment to administrative segregation for participation in the Behavior Management Program.

necessities. He claims he was placed on administrative segregation for five days following a minor infraction per the order of Major King and Lt. Drury. *Id*. at p. 8. He wrote numerous letters to the warden and others complaining about his placement, but his complaints were dismissed by the warden at NBCI because classification decisions are not addressed through the administrative remedy procedure (ARP). Plaintiff states he never had an opportunity to contest any allegations against him.

Plaintiff further states that from August 2 through August 31, 2007, he was confined in the SMU at NBCI without proper hygiene products, a change of underclothes, writing material, and personal property. Paper No. 1 at p. 9. He states the purpose of his transfer was disciplinary, but he was given neither written notice, a chance to be heard, nor provided a factual basis for his transfer. He states he was only given vague explanations such as "security threat activity" and "that information is confidential." *Id*. Plaintiff claims that administrative segregation is supposed to be a temporary housing assignment from which inmates are removed once the reason for the initial assignment ceases to exist, but in his case, his stay in "solitary confinement" was for an indefinite duration limited only by the Defendants' discretion and Plaintiff's completion of a behavior management program. *Id*. at p 10.

Plaintiff states that under the Quality of Life program he is permitted only one hour per week of "privileges" which can be revoked by staff for "minor things" like talking to another inmate through the cell door or for covering the cell door window to shield the bright light shining from the tier. *Id*. at p. 11. The levels committee is empowered to reduce an inmate's level or deny advancement without written notice or a hearing. Plaintiff states that each level or level reduction is equivalent to a 60 to 90 days disciplinary segregation sentence. Plaintiff claims he was forced to stay on the most restrictive level, intake, despite never having received

an infraction.

Plaintiff states that regulations permit his placement in the SMU for being directly involved in or associated with violent behavior, which amounts to no criteria, because every inmate will at some time or another be associated with someone who commits a violent act. He notes that while he was in a fight six years prior to his placement in the SMU, inmates who committed recent acts of violence were not so assigned. Paper No. 1 at p. 11. Plaintiff concludes the regulations in place are overly broad, permitting arbitrary and erroneous placement in the SMU.

The conditions imposed in the SMU include a limit of one hour per week for recreation which is confined to an outdoor cage where inmates are required to remain restrained in leg-irons, handcuffs, security box, and a waist chain. *Id.* at p. 13. Plaintiff states that at times the restraints cut into his wrists and ankles, yet he was required to endure the pain in order to get out-of-cell time. He claims Defendants are aware that lack of exercise will put him at risk of physical and psychological deterioration, but they have remained deliberately indifferent to the risk. He further states that inmates who are assigned to administrative segregation are permitted to go to the law library, receive visitations, make phone calls, go to the commissary, and possess property, while inmates in the SMU are not permitted these things. Plaintiff states this is a violation of Division of Correction (DOC) regulations requiring administrative segregation inmates throughout the state to retain the same privileges. *Id.*

Plaintiff states he was not allowed to practice his religion since his arrival at NBCI because his property was sent home and no chaplain was assigned to the institution. Over a period of a little more than a year, Plaintiff was allowed to shower approximately 15 to 20 times. He states his showers are frequently revoked for offenses such as trying to talk to other inmates

3

assigned to the same housing unit.

The following evidence is gleaned from the record. On June 4, 2007, while confined at ECI, a search of Plaintiff's cell turned up letters advocating violence and prison riots. Paper No. 21 at Ex. 1, p. 43. One of the letters, written by Plaintiff,[2] states in part:

> Let the unjust of this prison be exposed but it will take more than two men to a cell isolated on lock up defenseless against fifteen armed officers with riot equipment who only severely injure vulnerable inmates. Had this erupted on the compound or any other facility state wide or thru out the country it would have lead to catastrophe, only the inmates wouldn't be the only casualty.

*Id.* Plaintiff is a leader of the Blood Stone Villains, a prison gang.[3] When asked about the letters in his cell, he said the letters were old. *Id.* A second letter found in Plaintiff's cell was written by an inmate who called himself Osama. The author of the letter was identified as inmate Artemis Booker, also a highly ranked member of the Bloods. Booker's letter discusses his opinion that inmates must take a stand and that a mass disturbance could be accomplished if inmates set aside their other allegiances and focused their violence on correctional officers. *Id.* at p. 44. Because both Plaintiff and Booker had a violent history including weapons possession and causing disturbances, it was recommended that both men should have their security levels increased. *Id.* In addition, Plaintiff was assigned to administrative segregation pending investigation because during the same cell search the letters were found, one hundred dollars in cash was found. *Id.* at p. 38. Plaintiff received a Notice of Infraction for the money found in his

---

[2] Investigators noted that Plaintiff could be verified as the author of the letter found because he makes reference to being taken to the classification area with two other inmates whom he identifies by nickname. Case manager B. Bozman confirmed that a meeting took place with Plaintiff and the two inmates identified in the letter. *Id.* at p. 44.

[3] In addition to the evidence gathered by correctional intelligence, Plaintiff's body tattoos signify his gang affiliation.

4

cell, was ultimately found guilty of violating Rules 311 and 406[4], and was sentenced to serve 60 days segregation. *Id.* at p. 37.

On July 10, 2007, Plaintiff was approved for transfer to maximum security and transferred to NBCI. *Id.* Once there, a case management team reviewed his status on August 7, 2007, and noted a plan to place him into the Levels program. *Id.* at p. 36. From August 28, 2007 through November 20, 2007, Plaintiff's monthly case management reviews recommended "continue on admin. seg" and noted "Inmate will be placed into NBCI Levels program." *Id.* at pp. 32 – 35. There is no indication on the documents regarding whether Plaintiff was present for the review.

From December 18, 2007 through April 10, 2008, Plaintiff was in the Quality of Life (QOL) Behavior Management Program (BMP), but never progressed beyond level one. *Id.* at pp. 27 – 31. On April 22, 2008, Plaintiff informed the case management team that he refused to participate in the BMP/QOL, leading to his reassignment from "QOL/Ad Seg 120" to Administrative Segregation. *Id.* at p. 26. On May 20, 2008, Plaintiff again stated his refusal to participate in the program to the case management review team and his assignment on administrative segregation was continued with the rationale that there were "reasons to believe inmate is a threat to institution inmates, and/or staff." *Id.* at p. 25. On June 20, 2008, it was again noted that Plaintiff was refusing to participate in the program and that his assignment to administrative segregation be continued for security reasons. It was also noted that Plaintiff refused to attend the case management review. *Id.* at p. 24.

On July 15, 2008, Plaintiff's administrative segregation review again noted that he had waived his appearance, was not participating in the program, and should remain in administrative

---

[4] Rule 311 prohibits the unauthorized possession of government currency, and Rule 406 prohibits possessing, passing, or receiving contraband. DCD 105-4, Appendix 1.

segregation status. *Id.* at p. 23. Plaintiff was charged with a disciplinary infraction on July 16, 2008, which resulted in the imposition of 150 days of disciplinary segregation. Reviews conducted between August 12, 2008 and December 2, 2008, during his disciplinary segregation sentence, resulted in no change of Plaintiff's status. *Id.* at pp. 18 – 23. Plaintiff was considered for parole on September 26, 2008; parole was denied. *Id.* at p. 17. The case management team noted in its December 2, 2008 review that additional information regarding Plaintiff would be requested from the intelligence unit. *Id.* at p. 18.

By the time further review was conducted on December 29, 2008, Plaintiff's disciplinary segregation sentence had been served, but the case management team recommended that he remain assigned to administrative segregation. *Id.* at p. 17. The team noted the history of Plaintiff's status as a gang leader, involvement in a riotous incident at ECI in August of 2006, the letter found in his cell at ECI, his lack of participation in the BMP and refusal to participate in any other programming, and the infraction involving a fist fight in the rec hall. *Id.* There is no indication whether Plaintiff attended the review or waived his appearance.

At the January 27, 2009 review hearing the same history was noted by the team and, again, a recommendation that Plaintiff remain administrative segregation status was made. *Id.* at p. 16. Plaintiff "declined to be interviewed" for the review. *Id.* One of the team members, however, disagreed with the recommendation because:

> No new intel provided. [Plaintiff] was caught with letters . . . approx. 18 months ago. [Plaintiff] has only received one infraction since. It is noted [Plaintiff] has not participated in BMP or non-BMP cog[native] programming, however his current behavior does not warrant continuance of Ad Seg housing.

*Id.* At Plaintiff's subsequent segregation review on February 23, 2009, the non-concurring rationale was adopted and he was removed from administrative segregation. *Id.* at p. 15.

6

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(c) which provides that:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment >may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set

7

forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

## Analysis

In the prison context there are two different types of constitutionally protected liberty interests which may be created by government action. The first is found when there is a state-created entitlement to an early release from incarceration. *Board of Pardons v. Allen*, 482 U. S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U. S. 539, 557 (1974) (state created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995). Thus, before deciding whether Plaintiff is entitled to due process, it must be determined if the conditions under which he was confined constituted an atypical and significant hardship.

The Supreme Court found a liberty interest implicated where inmates in Ohio were assigned to the Ohio State Penitentiary (OSP), a super-maximum security prison where almost all human contact was prohibited and communication between cells was forbidden. Exercise was limited to one hour a day in a small indoor room, and the inmates were exposed to light 24 hours per day. *See Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). The Court noted that although the conditions alone were not enough to create a liberty interest, when coupled with the indefinite duration of assignment[5] to the prison and the disqualification of an otherwise eligible

---

[5] The District Court noted that the length of an inmate's stay at the prison was a function of the procedures for review in place. *See Austin v. Wilkinson*, 189 F.Supp.2d 719, 740 (N.D. Ohio 2002). Inmates assigned to the prison could only progress through the various levels after reclassification reviews which were conducted annually and "even inmates with exemplary behavior rarely progress through OSP in less than two years." *Id.*

8

inmate for parole consideration, the conditions "impose an atypical and significant hardship within the correctional context." *Id.* at 224.

Applying the Supreme Court's rationale, this court has held that a transfer to MCAC implicated procedural due process protections, and found that:

> In light of the prohibition of "almost all human contact," coupled with severe restrictions on movement or any type of activity, both of which may last for the duration of some inmates' underlying sentences, and may be less likely to be relieved by parole than the less arduous conditions at other facilities, the conditions at MCAC create such a hardship when judged against "any plausible baseline." Inmates thus have a protected liberty interest in avoiding transfer to MCAC.

*Farmer v. Kavanaugh*, 494 F. Supp. 2d 345, 358 (D. Md. 2007).

In the *Wilkinson* case the Supreme Court found that the process provided to Ohio inmates assigned to OSP complied with due process protections, noting that the Ohio inmates receive written notice 48 hours in advance of a hearing "summarizing the conduct or offense triggering the review" and are provided a prepared form explaining why the review was initiated. *Wilkinson*, 545 U.S. at 216. The Ohio inmates are permitted to attend the hearing where they are allowed to offer "pertinent information, explanation and/or objections to OSP placement and may submit a written statement," but may not call witnesses. *Id.* In addition to the notice and the hearing, the Ohio system included a review of the committee's decision by the warden, who must provide reasons for an approval of an assignment, as well as an additional review by a bureau which is vested with final decision-making authority over all inmate assignments in Ohio. *Id.* After these reviews are completed, the inmate is allowed 15 days to file objections with the Bureau and it is only after this 15 day period expires that the inmate is transferred to the facility. *Id.* at 217. Inmates who are transferred are given another review within 30 days of their arrival and, thereafter, are reviewed yearly. *Id.*

9

The three factors to be balanced to determine how much process is due are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-225, *citing Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The mere transfer of a prisoner from one facility to another does not create a liberty interest. *See Meachum v. Fano*, 427 U.S. 270 (1976). Thus, Plaintiff was not entitled to due process protections prior to his transfer. Moreover, as a prisoner, Plaintiff is not entitled to the process due to persons at liberty prior to his assignment to administrative segregation. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. In short, he is not entitled to an adversarial hearing, witnesses, evidence introduction, or other accoutrements of a full trial.

Plaintiff was given notice that his security level was being raised to maximum level due to the letters and cash found during the search of his cell. In addition to the process provided by the case management team's consideration of Plaintiff's security level and housing assignment, Plaintiff was provided with an adjustment hearing regarding the money found in his cell. The cause for Plaintiff's transfer from ECI to NBCI as a maximum security prisoner was no mystery and Plaintiff cannot claim he was not apprised of the reasons. Indeed, Plaintiff was asked to explain the presence of the letters in his cell and he stated that the letters were old. Prison officials are not required to take Plaintiff at his word; rather, they are free to extrapolate meaning

10

from the evidence gathered to make their decisions. In determining whether the challenged conditions amount to punishment, it is not the province of this Court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995).

Plaintiff's continued assignment to administrative segregation was reconsidered every month he was there. Plaintiff participated in the QOL-BMP program without much success and opted out of the program. He cannot claim that he was kept in administrative segregation solely because he refused to participate in the programming in light of the fact that he was found guilty of fighting with another inmate while assigned to administrative segregation which brought with it a 150 day disciplinary segregation sentence. Soon after the disciplinary segregation sentence was completed it was noted that no additional information implicating Plaintiff in any current gang activity had been produced. At that point, Plaintiff was released into general population.

The process afforded Plaintiff was constitutionally sufficient under the circumstances of this case. Accordingly, Defendants are entitled to summary judgment in their favor. A separate Order follows.

October 24, 2013
Date

/s/ Richard D. Bennett
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE